# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

BARBARA MONTAGUE,

      Plaintiff,

v.

SODEXCO, INC. AND YALE-NEW HAVEN HOSPITAL, INC.,

      Defendants.

No. 3:15-cv-00972 (MPS)

## RULING ON MOTIONS FOR SUMMARY JUDGMENT

Plaintiff Barbara Montague filed this action against Defendants Sodexo, Inc. ("Sodexo")[1] and Yale-New Haven Hospital, Inc. ("YNHH") after Montague was terminated from her employment with Sodexo and from her placement at YNHH. Montague brings claims for discrimination on the basis of race, color, sex, religion, and marital status in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* (Count One); age discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 *et seq.* (Count Two); discrimination based on the filing of a workers' compensation claim in violation of Conn. Gen. Stat. § 31-290a (Count Three); disability discrimination in violation of the Americans with Disabilities Act ("ADA") (Count Four); intentional infliction of emotional distress (Count Five); and discrimination in violation of the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. § 46a-51 *et seq.* (Count Six). (ECF No. 20.)

---

[1] Sodexo notes that it has been incorrectly identified in this litigation as "Sodexco, Inc." Sodexo Operations, LLC, a wholly-owned subsidiary of Sodexo, Inc., is the payroll entity that employed Plaintiff. (ECF No. 58-2 at 1 n.1.)

On November 21, 2016, Sodexo and YNHH filed motions for summary judgment. (ECF Nos. 54, 58.) Defendants contend that Montague's claims, to the extent they are based on any events that occurred prior to Montague's departure for medical leave, are time-barred; that the undisputed evidence in the record shows Montague's termination was due to Sodexo's decision to downsize by eliminating 134 positions; that Montague failed to meet her burden in producing evidence that her termination was on the basis of her race, color, religion, marital status, sex, age, claimed disability, or receipt of workers' compensation benefits; and that Montague failed to put forth evidence to support a hostile work environment claim.

For the reasons set forth below, Defendants' motions are GRANTED.

## I. Factual Background

The following facts are taken from Defendants' Local Rule 56(a)(1) Statements and the exhibits.[2] *See* Sodexo's Local Rule 56(a)(1) Statement, ECF No. 58-2; YNHH's Local Rule 56(a)(1) Statement, ECF No. 57. Because Montague did not file a Statement of Undisputed Material Facts pursuant to Local Rule 56(a)(2), the material facts set forth in Defendants' Local Rule 56(a)(1) statements and supported by the evidence will be deemed admitted. L.R. 56(a)(1) ("Each material fact set forth in the Local Rule 56(a)1 Statement and supported by the evidence will be deemed admitted (solely for purposes of the motion) unless such fact is controverted by the Local Rule 56(a)2 Statement required to be filed and served by the opposing party in accordance with this Local Rule . . . .). *See also Burke v. Town of East Hartford*, No. 14-CV-662 (JCH), 2016 WL 8709993, at *1 n.3 (D. Conn. Mar. 4, 2016) ("[Plaintiff] failed to file the requisite Local Rule 56(a)(2) Statement among his papers opposing the defendants' Motion. By operation

---

[2] Montague included with her opposition papers only a single exhibit, a four-page affidavit. (ECF No. 60-1; ECF No. 61-1.)

of Local Rule 56(a)(1), this failure has the effect of 'deem[ing] admitted' 'all material facts set forth in [the moving party's Local Rule 56(a)(1) Statement] and supported by the evidence."). The facts are undisputed unless otherwise stated.

### A. Montague Becomes a General Manager at Sodexo

Montague, who is an African-American woman and Pentecostal, and was born in 1958, began working for Sodexo in 2004. (ECF No. 56-2 at 2; ECF No. 57 ¶¶ 1-2; ECF No. 58-2 ¶¶ 1-2.) In May 2007, Montague became the Operations Manager at Sodexo client YNHH, assigned to work in YNHH's Service Response Center ("SRC"), which handles maintenance requests within the hospital. (ECF No. 57 ¶ 3, 5; ECF No. 58-2 ¶ 8; ECF No. 58-3 at 24, 26; ECF No. 58-8 at 9-10; ECF No. 60-1 ¶ 3.) The position was a promotion from Montague's previous Sodexo position at Stamford Hospital and came with a pay increase. (ECF No. 58-2 ¶ 9; ECF 58-3 at 24, 32.) Montague was employed by Sodexo and assigned to perform services at YNHH through its vendor contract with Sodexo. (ECF No. 56-1 at 25; ECF No. 57 ¶ 4.)

After she had been Operations Manager for approximately one month, in June 2007 Montague was asked and agreed to fill in as the General Manager for YNHH's SRC, while Sodexo looked for candidates to fill the position on a more permanent basis. (ECF No. 58-2 ¶ 10; ECF No. 58-3 at 31.) Montague filled in as the General Manager for several months, overseeing service provision by employees at YNHH. (ECF No. 58-2 ¶ 11; ECF No. 58-3 at 34-36, 38.) Montague testified at her deposition that she "didn't know what [she] was doing as ops manager, so [she] certainly didn't know what [she] was doing as GM" (ECF No. 58-3 at 35), and that she felt "totally green" and left "in the GM position by [her]self." (ECF No. 58-3 at 51.)

In her affidavit, Montague states that she "received no training" for her position as Operations Manager, or for when she filled in as General Manager. (ECF No. 60-1 ¶¶ 3-4.)

Montague testified at her deposition, however, that she completed all of the classes required to become a General Manager. (ECF No. 58-3 at 41.) She also testified that during the 11-month period in which she was filling in as General Manager, she did not have any complaints about being treated unfairly. (ECF No. 58-3 at 41.) Montague did not request additional training from Defendants while filling in as General Manager. (ECF No. 58-2 ¶ 11; ECF No. 58-3 at 35-37.)

After filling in as General Manager for several months, in March 2008 Montague was offered, and she accepted, the position of General Manager 2, a promotion that resulted in another pay increase. (ECF No. 58-2 ¶ 12; ECF No. 58-3 at 37-38, 42-43; ECF No. 58-8 at 12-13.) Montague took classes as part of her training as a General Manager 2. (ECF No. 58-2 ¶ 13; ECF No. 58-3 at 40.) Montague testified that she believes she completed all of the classes that were required to use the service tracking application she used in her position. (ECF No. 58-2 ¶ 13; ECF No. 58-3 at 43.) Montague testified that she also received training regarding use of the application and Sodexo's procedures from a Senior Manager and a Customer Service Manager in the Express Services Division of which the SRC was a part. (ECF No. 58-2 ¶¶ 14-15; ECF No. 58-3 at 44-49; ECF No. 58-8 at 4 ¶ 12.) A Senior Manager in the Express Services Division, "went over some things with" Montague, though Montague testified that "just showing someone something doesn't mean that they are trained." (ECF No. 58-4 at 1; ECF No. 58-8 at 4 ¶ 12.)

Montague never complained to anyone at Sodexo that she was not receiving sufficient training; Montague testified that she "did not realize that – you don't realize what you are missing until you see someone else who has something that you don't have." (ECF No. 58-2 ¶ 16; ECF No. 58-4 at 2-3.)

**B. A YNHH Employee Allegedly Makes Racially Discriminatory Comments Regarding Montague's Marriage**

In December 2009, Montague married Harry Nicholls, a white man who was employed by YNHH as a System Director. (ECF No. 56-1 at 3; ECF No. 57 ¶ 7; ECF No. 60-1 ¶ 5.) According to Montague, in or around December 2009 or January 2010, David Wurcel, a Vice President at YNHH and Nicholls' supervisor, told Nicholls that he had "ruined his career by marrying a black woman," and that "[b]lack women are to be played with, not married." (ECF No. 58-4 at 46, 49-50, 59; ECF No. 60-1 ¶ 6.) Montague also testified that Wurcel's "characterizations of [Montague] were negative," which bothered Nicholls. (ECF No. 56-1 at 50.) Montague testified that Wurcel made these comments around the time Montague and Mr. Nicholls returned from their honeymoon, and that Montague "knew that when Harry and [she] got married, his boss didn't like it." (ECF No. 58-3 at 12.) Montague states in her affidavit that she knew of these statements because her husband relayed them to her. (ECF No. 60-1 ¶ 7.) Montague does not contend that anyone at Sodexo expressed agreement with Wurcel's comments; she testified, rather, that people at Sodexo congratulated her on her marriage to Nicholls. (ECF No. 58-3 at 13.) Montague provides no evidence that anyone at Sodexo knew of Wurcel's comments.

Montague testified that in January 2010, while at a holiday party, she reported Wurcel's comments to Kevin Myatt, the senior vice president of Human Resources at YNHH. (ECF No. 58-4 at 26-27; ECF No. 60-1 ¶ 8.) Montague testified that she did not recall that Myatt said anything in response, but that he "may have said something along the lines [of], [']there is a new sheriff in town.[']" (ECF No. 58-4 at 27.) Montague testified that she did not ask Myatt to elaborate, and hoped that his statement meant that comments like Wurcel's would not be tolerated. (ECF No. 58-4 at 28.)

### C. Montague's Receives Notice of Low Performance Scores at Work in her 2010 and 2011 Performance Reviews

YNHH administered employee engagement surveys annually to gauge how YNHH employees felt about their managers. (ECF No. 58-2 ¶ 17; ECF No. 58-3 at 16; ECF No. 58-8 at 3 ¶ 5.) Beginning in or around 2010, Montague's employee engagement surveys were low. (ECF No. 58-2 ¶ 17; ECF No. 58-3 at 16.)

In Montague's performance review for the 2011 fiscal year, dated October 9, 2011, Montague received ratings of "Meets Expectations" or "Above Expectations" for all of her performance goals, with the exception of one goal, for which she received an "Outstanding" rating. (ECF No. 58-8 at 15-27.) Under the performance goal titled "Building a Diverse Team," the "Manager Comments" stated, "Barb's efforts in this area must be reflected in the upcoming hospital employee satisfaction scores." (ECF No. 58-2 ¶ 18; ECF No. 58-4 at 31; ECF No. 58-8 at 22.) Under "Managing Employee Performance and Development (GM)," the "Manager Comments" noted, "Barb needs to continue to focus on items that will help to increase employee satisfaction levels within her department. Currently, our scores are the lowest in the support service division and she needs to maintain vigilant [*sic*] on determining ways to increase employee satisfaction." (ECF No. 58-4 at 31-32; ECF No. 58-8 at 24.) Under "Manager Overall Comments," the review stated that Montague "must keep in the forefront her relationships with her staff to assure their satisfaction is reflected in the employee satisfaction survey." (ECF No. 58-2 ¶ 18; ECF No. 58-8 at 27.) Montague testified that in 2011, it was made clear to her that employee satisfaction surveys were very important. (ECF No. 58-4 at 32.)

### D.  Montague Takes FMLA Leave After Her Husband Passes Away

Montague's husband, Nicholls, passed away on February 11, 2012, three days before he and Montague were scheduled to finalize their divorce. (ECF No. 56-1 at 64; ECF No. 58-2 ¶ 53; ECF No. 58-6 at 1; ECF No. 59 at 25; ECF No. 60-1 ¶ 9.) In February 2012, Montague saw a

social worker in relation to the emotional distress she suffered after her husband's death, which was the sixth death in her family in six months. (ECF No. 58-3 at 8; ECF No. 59 at 13-14.)

On February 13, 2012, Wurcel sent an email to YNHH employees informing them of Nicholls's death. (ECF No. 58-9 at 43-44; ECF No. 60-1 ¶ 10.) The email did not identify Montague as his widow, though it referenced Nicholls' four children. (ECF No. 58-9 at 43-44; ECF No. 60-1 ¶ 10.) The email attached an obituary for Nicholls, which listed Montague among Nicholls's close family and friends. (ECF No. 56-2 at 39.) Montague states in her affidavit that "Wurcel attempted to control [her] husband's funeral arrangements, not acknowledging [Montague] as Mr. Nicholls' wife, following his death, continuing his pattern of discrimination for [her] husband as well as [for Montague]. He also used his disapproval of [Montague's] biracial marriage in decisions relating to [her] status at work," although she does not specify how. (ECF No. 60-1 ¶ 12.) Montague states that "[a]s a result of these acts by Mr. Wurcel in his capacity as an officer of [YNHH], and Sodexo's acceptance and implementation of his wishes, [she] suffered great emotional distress and had to take a medical leave pursuant to the [FMLA]." (ECF No. 60-1 ¶ 13.)

Later, while reviewing a document from her employee file that had been printed out for her when she was checking in for an exam at YNHH, Montague saw that her marital status was listed in YNHH's employee records system as "divorced" rather than "widowed," despite the fact that Nicholls had passed away shortly before the couple's divorce was finalized. (ECF No. 59 at 3; *see also* ECF No. 58-9 at 48; ECF No. 60-1 ¶ 11.) Montague handwrote corrections on the form, dated September 27, 2012, including to make clear that she was widowed rather than divorced,

and that Sodexo was her employer rather than YNHH. (ECF No. 56-1 at 69-70; ECF No. 58-9 at 48.)[3]

On March 21, 2012, weeks after her husband passed away, Montague took a leave of absence pursuant to the Family Medical Leave Act ("FMLA"). (ECF No. 58-2 ¶ 21; ECF No. 58-4 at 6; ECF No. 58-8 at 3 ¶ 6.) During Montague's FMLA leave, Sodexo employee Melvin Dockery filled Montague's prior role of managing the YNHH SRC. (ECF No. 58-2 ¶ 22; ECF No. 58-8 at 3 ¶ 6.) Dockery began working for Sodexo in or around 1997 and had served as a General Manager in the SRCs for other Sodexo clients. (ECF No. 58-2 ¶ 23; ECF No. 58-8 at 3 ¶ 7.) In March 2012, Dockery was between assignments at Sodexo, and was on Sodexo's Healthcare Resource Bench. (ECF No. 58-2 ¶ 23; ECF No. 58-8 at 3 ¶ 7.) Dockery is a white male who was married and in his early forties in 2012. (ECF No. 58-2 ¶ 23; ECF No. 58-6 at 29; ECF No. 58-8 at 3 ¶ 7.)

Montague testified that while she was out on FMLA leave, she had a conversation with Teresa Fripp, a YNHH employee who told Montague "that [Dockery] was going to be taking [Montague's] job, and that [Sodexo and YNHH] were going to use the employee opinion survey as the reason they are getting rid of [Montague]." (ECF No. 56-1 at 18; ECF No. 58-4 at 10.) Montague testified that she did not ask Fripp for the basis of that statement, and did not ask anyone at Sodexo or YNHH whether the statement was true. (*Id.*) Montague further testified that she learned from Fripp that Wurcel had said, in a meeting with YNHH Vice President of Administration Stephen Merz, which Wurcel "did not want . . . on the calendar," that YNHH "needed to get rid of" Montague, and that YNHH "wanted Sodexo to terminate [her] while [she]

---

[3] YNHH does not dispute it was Montague's employer for the purposes of the motion for summary judgment. (ECF No. 55 at 3 n.5.)

was out on FMLA." (ECF No. 56-1 at 51-52.) In her affidavit, Montague states that while on leave, she "received a phone call from a hospital liaison for Sodexo who explained, specifically, that Mr. Wurcel wanted to discuss terminating [her] for discriminatory reasons." (ECF No. 60-1 ¶ 14.)[4]

### E. Montague Returns from FMLA Leave and is Transitioned from her Role as General Manager

On or around May 2 or 3, 2012, Montague returned from FMLA leave and to a General Manager position. (ECF No. 57 ¶ 28; ECF No. 58-2 ¶ 24; ECF No. 58-4 at 7, 9; ECF No. 58-8 at 3 ¶ 6.) Montague testified that she came to think that she had not received sufficient training when she saw "how knowledgeable Melvin Dockery was" after she returned from her FMLA leave, and when Dockery told her that he had "received a host of training from the company." (ECF No. 58-4 at 2-4.) Montague also testified that although she was not invited to participate in conference calls, meals, and meetings with management, Dockery was while serving as a General Manager. (ECF No. 58-4 at 48-49.) At that point, Montague did not complain to anyone at Sodexo regarding her concern, though she asked Dockery to share some of the things that he had learned with her. (ECF No. 58-4 at 3.)

On May 29, 2012, Sodexo received a notice from YNHH, requesting that Montague be removed from the General Manager position. (ECF No. 58-2 ¶ 25; ECF No. 58-8 at 4 ¶ 11; ECF No. 58-8 at 7.) The letter, sent by Merz and addressed to Art Mesiti, then Sodexo's Regional Resident District Manager and Montague's supervisor, stated in relevant part:

> In follow-up to our most recent conversations, this letter is to notify you of the Hospital's desire to reorganize the leadership structure within the Hospital's Service Response Center served by Sodexo management . . . . To meet operation requirements and to address ongoing issues regarding employee satisfaction and financial performance, we would like to request that the General Manager Position be replaced and substituted for another Sodexo staff member. Barbara Nicholls may

---

[4] It is not clear whether Fripp is the hospital liaison to whom Montague refers in her affidavit.

maintain her role as a leader within the SRC but not as the primary role as the General Manager.

(ECF No. 58-8 at 7.)

On May 31, 2012, Montague acknowledged receipt of a "Constructive Counseling Notice" from Sodexo. (ECF No. 58-8 at 40.) The notice stated that "[f]or the 3rd consecutive year, the SRC Department results distributed in January, under Barbara's leadership, were unacceptable & amongst the lowest in the facility[.]" (ECF No. 58-8 at 40.) The notice also stated that "[f]urther disciplin[e] up to & including termination may occur" if the "employee d[id] not demonstrate and maintain satisfactory performance or conduct[.]" (*Id.*) Montague testified that she met with Mesiti in May 2012 in connection with the notice. (ECF No. 58-4 at 24.)

On June 22, 2012, YNHH employees Merz and Carlos Lourenco met with Montague to inform her of YNHH's decision to remove her from the General Manager position. (ECF No. 57 ¶ 35; ECF No. 58-2 ¶ 26; ECF No. 58-3 at 14-16; ECF No. 60-1 ¶ 17.) Montague testified that at the June 22, 2012 meeting, Montague was informed that she "had done a very good job," and "was well-respected at the hospital," but that her employee engagement scores were "among the lowest" for the past three annual surveys, such that "there couldn't be a fourth." (ECF No. 58-3 at 15-16.) Montague was informed that Dockery would be transitioning into the role of General Manager of the SRC, and that YNHH wanted Montague to instead manage the transition of St. Raphael's Hospital ("St. Ray's") into the SRC process, beginning July 1, 2012. (ECF No. 57 ¶ 38; ECF No. 58-2 ¶ 26; ECF No. 58-3 at 15; ECF No. 60-1 ¶ 17.)  Lourenco and Merz informed Montague that the St. Ray's transition would last approximately six months, i.e., until January 1, 2013, and that there would be other projects for Montague after that period. (ECF No. 58-2 ¶ 26; ECF No. 58-3 at 15.)

Montague subsequently met with Mesiti again, who informed Montague that her assignment handling the St. Ray's Hospital transition would be temporary, and would end in six months. (ECF No. 58-2 ¶ 27; ECF No. 58-4 at 11-12.) Montague told Mesiti that she understood from her conversation with YNHH representatives that there would be other projects for Montague to work on following the St. Ray's Hospital transition. (ECF No. 58-4 at 12, 18.) Mesiti informed Montague that after the temporary assignment ended, if she "didn't find another position, [she] would be let go." (ECF No. 58-4 at 18, 20.) Montague testified that she did not tell Mesiti that she felt she was being treated unfairly, or make any complaints about discrimination, harassment, or retaliation, because she "felt like he was part of the group that[] [was] doing this to" Montague. (ECF No. 58-4 at 13.)

After her conversation with Mesiti, Montague spoke with Georgia Colquhon-Pryce, a Sodexo Human Resources Director, who informed Montague that after the temporary assignment, Montague "would have two weeks to find another position." (ECF No. 58-2 ¶ 30; ECF No. 58-4 at 13-15, 19, 20; ECF No. 60-1 ¶ 18.) Montague testified that she did not tell Colquhon-Pryce that she felt she was being treated unfairly because Montague "felt like [Colquhon-Pryce] was aware of what was going on in the transition . . . ." (ECF No. 58-4 at 14.) Montague testified that it was her impression that Colquhon-Pryce would get clarification on whether there would be projects for Montague after the temporary assignment was scheduled to end, but Montague did not follow up with Colquhon-Pryce regarding the issue. (*Id*. at 20.)

### F. Montague Manages the St. Ray's Transition and Receives Her 2012 Performance Review

On July 1, 2012, Montague began her temporary assignment of handling the St. Ray's Hospital transition. (ECF No. 58-2 ¶ 32.) In this role, Montague's title as General Manager at Sodexo, as well as her compensation, remained the same as in her previous role. (ECF No. 58-2 ¶

32; ECF No. 58-4 at 17.) However, Montague testified that she felt that she was being supervised more closely than other employees, including by "having to create daily reports," having to meet with a supervisor daily, and having to print out her calendar around this time. (ECF No. 58-3 at 7.)

On July 31, 2012, Mesiti emailed Montague to inform her that her position managing the St. Ray's transition had been extended until March 2013. (ECF No. 58-2 ¶ 33; ECF No. 58-9 at 5.)

In Montague's performance review for the 2012 fiscal year, under the goal of "Developing Our People (GM)," Sodexo Human Resources Manager Cassandra Douglas noted, "continued development needed in team building per low employee engagement scores . . . ." (ECF No. 58-8 at 30.) With respect to the goal of "Service and Value (GM)," Montague herself noted, "Employee engagement needed to be improved." (*Id*. at 32.) Montague electronically signed the 2012 performance review on November 9, 2012, to confirm her receipt of the evaluation. (*Id*. at 37.)

On September 4, 2012, Douglas had a call with Montague to help Montague find another position after completing the St. Ray's transition. (ECF No. 58-2 ¶ 34; ECF No. 59 at 9-10.)

### G. Montague Takes Medical Leave and Settles a Workers' Compensation Claim with Sodexo

One of Montague's duties in her role managing the St. Ray's Hospital transition was data entry. (ECF No. 56-1 at 26-27; ECF No. 60-1 ¶¶ 19-20.) On December 5, 2012, after conducting data entry for five consecutive days, Montague reported suffering a shoulder injury to Sodexo. (ECF No. 58-2 ¶ 35; ECF No. 58-4 at 22-23.) Beginning on December 7, 2012, Montague took a leave of absence related to the injury, after a doctor told her that she hurt her shoulder as a result of the data entry assignment and diagnosed her with a herniated disc. (ECF No. 58-4 at 23; ECF No. 58-8 at 3 ¶ 8; ECF No. 60-1 ¶ 21.) Sodexo initially expected Montague to return from leave on April 15, 2013, but her leave was extended, with a return date of July 17, 2013. (ECF No. 58-

8 at 3 ¶ 8; ECF No. 58-9 at 7; ECF No. 58-9 at 9.) The letter extending her leave specified that Montague had exhausted her FMLA Job-protected leave in March 2013, such that Sodexo could no longer guarantee that Montague would be reinstated to the same or an equivalent position upon returning. (ECF No. 58-9 at 9.)

Montague never returned to work after December 5, 2012. (ECF No. 58-6 at 12; ECF No. 56-1 at 36.) Montague filed for Workers' Compensation on December 31, 2012, listing Sodexo as her employer. (ECF No. 56-3 at 2; ECF No. 60-1 ¶ 22.) Montague began receiving Workers' Compensation benefits in connection with the injury in December 2012. (ECF No. 59 at 1-2.)

Montague remained unable to return to work, and was "completely unable to work," until May 2016. (ECF No. 58-2 ¶ 44; ECF No. 58-4 at 25-26; ECF No. 58-9 at 23.) In or around July 2016, Montague entered into a Stipulation for Full and Final Settlement ("the Stipulation") related to her workers' compensation claim against Sodexo. (ECF No. 58-2 ¶ 56; ECF No. 58-9 at 50-56.) The Stipulation contained the following provision:

> This agreement specifically releases all of the Claimants' rights pursuant to CGS § 31-290a. The agreement specifically does not release or waive any rights and claims pursuant to federal or state statutes, common law or regulations, as they pertain to work place discrimination, negligence, breach of contract, misrepresentation or infliction of emotional distress as claimed in Claimant's federal court action against Respondent Sodexo, Inc. and Yale New Haven Hospital entitled: Montague v. Sodexo, 3:15-cv-00972-MPS.

(ECF No. 58-9 at 54.)

### H. Montague's Temporary Assignment Ends and Montague is Terminated After She Fails to Secure a New Position with Sodexo

On January 23, 2013, while Montague was on medical leave, Douglas emailed Montague, informing Montague of an opening for a Sodexo SRC Operations Manager 1 at YNHH, and asking that Montague advise of her interest in applying for the position. (ECF No. 58-2 ¶ 38; ECF No. 58-9 at 12.) Douglas wrote, "I realize that you are on an LOA, but wanted to share the information

regarding the posting below. Please advise of your interest in posting for the position." (ECF No. 58-9 at 12.) The posting specified that the "Operations Manager of the [SRC] w[ould] report to the General Manager of the [SRC] and w[ould] oversee approx[imately] 20 employees." (ECF No. 58-9 at 12.) On March 2, 2013, over a month after the email was sent, Montague responded to Douglas, writing that she had "not been checking [her] email on a regular basis." (ECF No. 58-9 at 11; ECF No. 59 at 1.) Montague wrote, "I am interested in returning to work but have probably missed this opportunity. I am still having pain…" (*Id*.)

Montague did not apply for any positions with Sodexo while in her temporary role as manager of the St. Ray's transition or while on FMLA leave, including following her call or email correspondence with Douglas. (ECF No. 58-2 ¶ 34; ECF No. 58-4 at 21.) Montague testified that her "goal was to finish the project of the Hospital of Saint Ray's transition" and that she "was hoping that [she] wouldn't have to" look for another job, "based on what [YNHH] had said[,] that there would be other projects to work on." (ECF No. 58-4 at 21.)

In March 2013, while Montague was out on medical leave, Montague's St. Ray's assignment ended as scheduled. (ECF No. 58-2 ¶ 39; ECF No. 58-8 at 3 ¶ 9.) Rather than terminating Montague's employment, Sodexo kept her on its payroll and on its Healthcare Resource Bench, though her payroll file had been transferred to the Healthcare Resource Bench in August 2012, before Montague left for medical leave. (ECF No. 58-2 ¶ 39; ECF No. 58-8 at 3 ¶ 9.)

On March 4 or 5, 2013, Colquhon-Pryce sent Montague a letter saying that Sodexo would be eliminating its Healthcare Resource Bench by August 2, 2013, and that if Montague wished to remain employed by Sodexo after that date, she had to find another position within Sodexo. (ECF No. 58-2 ¶ 40; ECF No. 58-4 at 52-53; ECF No. 58-9 at 15-17.) The transmission letter sent by

Colquhon-Pryce further stated, "Please note that your current approved leave of absence will not change. If you are able to return to work when your leave of absence expires, we will conduct a reasonable search for a new resource assignment within your region. If we cannot locate another assignment, you will be provided two weeks with pay to secure a new position within Sodexo." (ECF No. 58-9 at 15.) Sodexo's letter further provided, "Given these changes, it is important for you to prepare for potential layoff by updating your resume, reviewing open positions within the organization, and posting to those positions for which you are qualified." (ECF No. 58-9 at 17.)

In a follow-up letter dated July 31, 2013, Sodexo informed Montague that her anticipated last date of employment would be August 2, 2013 as a result of Sodexo's decision to eliminate the Healthcare Resource Bench. (ECF No. 58-2 ¶ 42; ECF No. 58-4 at 54; ECF No. 58-9 at 19.) On August 2, 2013, Sodexo terminated the employment of all 134 employees on its Healthcare Resource Bench, including Montague. (ECF No. 58-2 ¶ 43; ECF No. 58-8 at 4 ¶ 10; ECF No. 60-1 ¶ 23.) Montague states in her affidavit that she was terminated because she "was on leave and filed a workers' compensation claim." (ECF No. 60-1 ¶ 23.)

## I. Montague Files Charges with the CHRO and EEOC

At no point during her employment with Sodexo did Montague make a complaint of discrimination, harassment, or retaliation. (ECF No. 58-4 at 26.) Montague testified that this was because Montague believed "Sodexo was involved with [YNHH] according to what Teresa Fripp told" her. (*Id*.)

On January 28, 2014, Montague filed a complaint with the Connecticut Commission on Human Rights and Opportunities ("CHRO") and the Equal Employment Opportunities Commission ("EEOC"). (ECF No. 58-2 ¶ 46; ECF No. 58-9 at 26-41; ECF No. 60-1 ¶ 24.) According to Douglas, Sodexo first learned about Montague's claims of discrimination when

Sodexo received notice of Montague's CHRO filing. (ECF No. 58-2 ¶ 7; ECF No. 58-8 ¶¶ 3-4.) Montague received "Right to Sue" letters from the CHRO on March 27, 2015, with respect to Sodexo and April 29, 2015, with respect to YNHH, and from the EEOC on April 6, 2015, with respect to Sodexo and April 30, 2015, with respect to YNHH. (ECF No. 20 at 16-20; ECF No. 60-1 ¶¶ 25-26.) Montague filed this lawsuit on June 24, 2015. (ECF No. 1.)

**J. Sodexo's Employee Handbook**

Sodexo's March 2009 Employee Handbook ("the March 2009 Handbook") states that employment at Sodexo is "terminable at any time by either you or us, with or without cause and with or without notice. This Handbook is not a contract of employment." (*Id.* ¶ 3; ECF No. 59-1 at 6.) The March 2009 Handbook further states, under "Equal Employment Opportunity,"

> [Sodexo] will provide equal employment opportunity without regard to race, color, religion, . . . age, marital status, . . . gender, . . . or any other basis protected by law. This commitment extends to all aspects of employment, including but not limited to hiring, promotion, transfer, job assignments demotion, recruiting, advertising or solicitation, compensation, training, layoff or termination, participation in social and recreational function and use of employee facilities.

(ECF No. 58-2 ¶ 4; ECF No. 59-1 at 10.) The March 2009 Handbook also states,

> Any employee who in any way discriminates against or harasses a fellow employee, a customer, or any other person may be subject to immediate termination of employment. Sodexo will not retaliate against an individual because he or she opposes any unlawful practice, files or participates in any investigation of an internal claim or a formal charge of discrimination, or participates in any action under any anti-discrimination law . . . . If you believe that you have been discriminated against or harassed, you are encouraged to use the Promise of Respect and Fair Treatment and notify: [your manager, your manager's manager, or a Sodexo Human Resources manager].

(ECF No. 58-2 ¶ 5; ECF No. 59-1 at 11.)[5]

---

[5] Sodexo states in its Local Rule 56(a)(1) Statement that "[t]he March 2009 Sodexo Employee Handbook further contains procedures for filing a complaint regarding discriminatory or harassing conduct." (ECF No. 58-2 ¶ 6.) However, it appears that these procedures are primarily described in the section titled, "Raising a Concern through the Promise of Respect and Fair Treatment,"

## II.     Legal Standard

"Summary judgment is appropriate only if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." *Tolan v. Cotton*, 134 S.Ct. 1861, 1866 (2014) (internal quotation marks and citations omitted). The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–25 (1986). If the moving party carries its burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.,* 654 F.3d 347, 358 (2d Cir. 2011). On summary judgment a court must "construe the facts in the light most favorable to the nonmoving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Caronia v. Phillip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir. 2013).

It is "well-settled in this circuit that a party may not, in order to defeat a summary judgment motion, create a material issue of fact by submitting an affidavit disputing his own prior sworn testimony." *Trans-Orient Marine Corp. v. Star Trading & Marine, Inc*., 925 F.2d 566, 572-73 (2d Cir. 1991). However, a subsequent affidavit may create a material issue of fact if the affidavit "amplifies or explains, but does not merely contradict, [the] prior testimony." *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996).

## III.     Discussion

### A.  Title VII Claim

Title VII prohibits an employer from discriminating against an employee because of the employee's race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2(a)(1). In Count One,

---

which Sodexo did not include in the record. (*See* ECF No. 59-1 at 7, 10 (referencing the section on raising a concern through the "Promise of Respect and Fair Treatment," located on page 23 of the March 2009 Handbook).)

Montague brings Title VII claims on the grounds that Defendants discriminated against her on the basis of race and color, religion, sex, and marital status.[6] "A plaintiff may establish a claim of disparate treatment under Title VII either (1) by showing that he has suffered an adverse job action under circumstances giving rise to an inference of discrimination on the basis of race, color, religion, sex, or national origin, or (2) by demonstrating that harassment on one or more of these bases amounted to a hostile work environment." *Feingold v. New York*, 366 F.3d 138, 149 (2d Cir. 2004) (internal quotation marks and citation omitted). Montague brings her discrimination claims under both of these theories, which I analyze in turn below, after first determining whether Montague's Title VII claims are timely. (ECF No. 60 at 6.)

### 1. Timeliness

Where a state has an agency with authority to grant relief under Title VII, a plaintiff is required to "file an administrative complaint within 300 days of the complained-of conduct, and the basis for any subsequent federal court action must in turn be based on the conduct that could properly have been the subject of an administrative complaint." *Marini v. Costco Wholesale Corp.*, 64 F. Supp. 3d 317, 326 (D. Conn. 2014); 42 U.S.C. § 2000e-5(e)(1). Because "[d]iscrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify," *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002), "[e]ach discrete

---

[6] As Defendants point out, discrimination on the basis of marital status is not actionable under Title VII. 42 U.S.C. § 2000e-2(a)(1); *see also Panjwani v. Jet Way Sec'y & Investigations, LLC*, No. 13 Civ. 7186 (SLT)(VMS), 2016 WL 3675331, at *16 (E.D.N.Y. Feb 26, 2016) (collecting cases explaining that discrimination on the basis of marital status is not actionable under Title VII). Plaintiff is correct that policies that forbid or restrict the employment of married women that do not equally apply to married men violates Title VII's prohibition on sex discrimination (ECF No. 60 at 6)—but Montague does not assert that Defendants had any such policy. Therefore, Montague's claim asserting discrimination on the basis of marital status in violation of Title VII fails. In any event, Montague failed to exhaust this claim by neglecting to check the "marital status" box on her CHRO complaint or including any allegations therein sounding in marital status discrimination. (ECF No. 58-9 at 26.)

discriminatory act starts a new clock for filing charges alleging that act." *Id.* at 113. "[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Id.*[7]

Montague filed her administrative complaint on January 28, 2014. (ECF No. 58-9 at 26.) Thus, any discrete discriminatory act must have occurred on or after April 3, 2013, 300 days before that date, in order to be actionable. The only discrete conduct that Montague alleges occurred after April 3, 2013 (approximately four months after her last day of performing work for either Sodexo or YNHH) was her termination on August 2, 2013. Any disparate treatment claims based on any allegedly discriminatory acts that occurred while she was still going to work, prior to taking medical leave in December 2012, are untimely. However, as discussed below, "so long as at least one alleged adverse employment action occurred within the applicable filing period, evidence of an earlier alleged . . . act may constitute relevant background evidence in support of that timely

---

[7] Montague argues that the continuing violation doctrine operates to render her claim timely, as she was terminated within the limitations period. "Under the continuing violation exception to the Title VII limitations period, if a Title VII plaintiff files an EEOC charge that is timely as to any incident of discrimination in furtherance of an ongoing policy of discrimination, all claims of acts of discrimination under that policy will be timely even if they would be untimely standing alone." *Patterson v. Cnty. of Oneida, N.Y.*, 375 F. 3d 206, 220 (2d Cir. 2004) (internal quotation marks omitted); *see also Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 122 (2002). "To bring a claim within the continuing violation exception, a plaintiff must at the very least allege that one act of discrimination in furtherance of the ongoing policy [of discrimination] occurred within the limitations period." *Patterson*, 375 F.3d at 220. But the "mere fact that an employee was dismissed within the statutory period cannot be used 'to pull in [a] time-barred discriminatory act' . . . for 'continuity of employment, without more, is insufficient to prolong the life of a cause of action for employment discrimination.'" *Id.* (quoting *Morgan*, 536 U.S. at 112-13). Moreover, "[c]ourts in this circuit disfavor application of the continuing violations doctrine and hold that only compelling circumstances warrant use of this exception to the statute of limitations." *Ravenscroft v. Williams Scotsman, Inc.*, No. 3:14-CV-870 (MPS), 2015 WL 1311332, at *3 (D. Conn. Mar. 23, 2015) (quoting *Miner v. Town of Cheshire*, 126 F. Supp. 2d 184, 189-90 (D. Conn. 2000)). Apart from its potential applicability to the hostile work environment claim, which is discussed below, the continuing violation doctrine does not apply here, because Montague points to no evidence in the record from which a reasonable juror could infer that her termination was "in furtherance of [an] ongoing policy [of discrimination]." *Patterson*, 375 F.3d at 220.

claim." *Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 150 (2d Cir. 2012) (internal quotations and alterations omitted).[8]

### 2. Disparate Treatment Based on Termination

Montague's Title VII claim alleging disparate treatment based on her termination is subject to analysis under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this framework, Montague must establish a prima facie case of discrimination by showing that (1) she is part of a protected class under Title VII; (2) that she was qualified for her position; (3) that she suffered an adverse employment action; and (4) that the circumstances surrounding the employment action give rise to an inference of discrimination. *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 45 (2d Cir. 2015).

"If Plaintiff can establish a prima facie case, the burden shifts to the Defendant to proffer a legitimate, nondiscriminatory reason for the adverse employment action." *Adams-Martin v. Conn. Dep't of Dev. Servs.*, No. 3:10-CV-00099 (VLB), 2012 WL 878306, at *9 (D. Conn. Mar. 14, 2012) (citing *McDonnell*, 411 U.S. at 802) "This burden is one of production, not persuasion; it can involve no credibility assessment." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (internal quotations omitted). "If Defendant meets its burden of production, the burden shifts back to Plaintiff to show that the legitimate, nondiscriminatory reason offered by the Defendant is mere pretext for illegal employment discrimination." *Adams-Martin*, 2012

---

[8] YNHH argues that because Montague was no longer working at YNHH after December 5, 2012, that all claims under Title VII against YNHH are time-barred. (ECF No. 57 ¶¶ 46, 60.) However, Montague alleges in her Amended Complaint that she was terminated by both Sodexo and YNHH. (ECF No. 20 ¶ 30.) Though the record suggests that Sodexo was Montague's employer, and that YNHH was not (ECF No. 56-1 at 25, 69-70; ECF No. 56-3 at 2; ECF No. 58-8 at 9, 12), as YNHH notes, I need not decide whether a joint employment relationship existed among the parties. (*See* ECF No. 55 at 3 n.5.) Rather, I consider whether Montague has put forth evidence to meet her burden with respect to either defendant.

WL878306, at *9 (citing *McDonnell*, 411 U.S. at 804). "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

The parties do not dispute that Montague, an African-American female, is a member of a protected class, or that she suffered an adverse employment action when she was terminated. Defendants dispute that Montague was qualified for her position and that the circumstances surrounding Montague's termination give rise to an inference of discrimination on the basis of a protected characteristic.

### a.   Qualification for Position

Defendants argue that Montague was not qualified because she admitted in her deposition that was "completely unable to work" (ECF No. 58-4 at 26). Although "the qualification necessary to shift the burden to defendant for an explanation of the adverse job action is minimal" and a "plaintiff must show only that [she] possesses the basic skills necessary for performance of [the] job." *Slattery v. Swiss Reinsurance Am. Corp.*, 2448 F.3d 87, 92 (2d Cir. 2001) (internal quotations omitted), courts have held that where a plaintiff is "totally disabled and unable to perform any work," the plaintiff is unqualified for a position. *See Williams v. R.H. Donnelley Inc.*, 199 F. Supp. 2d 172, 177 (S.D.N.Y. 2002) (finding that plaintiff was unqualified for the job where plaintiff submitted evidence from her doctor stating that she was totally disabled and unable to perform any work) *aff'd*, 368 F.3d 123 (2d Cir. 2004); *Pesok v. Hebrew Union Coll. - Jewish Institute of Religion*, 235 F. Supp. 2d 281, 287 (S.D.N.Y. 2002) ("[Plaintiff] was unable to work due to his back problem when his employment [with Defendant] ended, and he has been unable to work ever since . . . . Thus, plaintiff was not qualified for the position in question and cannot establish the second element of his prima facie case.").

It is undisputed that Montague was unable to return to work from December 2012 until May 2016. (ECF No. 58-2 ¶ 44; ECF No. 58-4 at 25-26; ECF No. 58-9 at 23.) Montague stated in her affidavit that in December 2012, she had gone to a doctor who told her that she had suffered physical injuries as a result of her work assignment. (ECF No. 60-1 ¶ 21.) She testified at her deposition, "My doctor said I had a herniated disc or pinched nerve . . . and put me out of work." (ECF No. 58-4 at 23; *see also* ECF No. 58-4 at 25 (testimony that Montague's doctor "put [her] out of work" and never told her she could return).) Montague also testified that her current treating physician told her in May 2016 that she could return to work with restrictions, but had not released her prior to that time. (ECF No. 58-4 at 25-26.) She agreed with defense counsel that she was "completely unable to work" until May 2016 (ECF No. 58-2 ¶ 44; ECF No. 58-4 at 26). Montague herself characterized her injury as "life-altering" in her workers' compensation claim, writing that she would "never return to her profession . . . ." (ECF No. 58-2 ¶ 45; ECF No. 58-9 at 23.)

Montague argues that this case is distinguishable from *Williams*, as Montague did not go on an indefinite leave of absence rendering her unable to fill an open position. Rather, Montague's leave was first set to expire on April 15, 2013, but was then extended, with a return date of July 17, 2013. (ECF No. 60 at 9.) While she was on leave, a representative for Sodexo even reached out to Montague to see if she would be interested in applying for an Operations Manager position prior to the scheduled elimination of her job. (ECF No. 58-2 ¶ 38; ECF No. 58-9 at 12.) Therefore, Montague argues, Sodexo believed that Montague would be qualified to return to her job at the time Sodexo gave her notice in March 2013 that Sodexo would be eliminating the Healthcare Resource Bench by August 2, 2013. But Montague cites no authority suggesting that the "qualification" element of the prima facie case depends on the employer's awareness of whether the plaintiff was qualified, and the evidence in the record suggests that Sodexo was not fully aware

of the debilitating nature of her injury. (*See* ECF No. 58-9 at 11, in which Montague wrote, in response to an inquiry from Douglas as to Montague's interest in applying for a position at Sodexo while on leave, that she was "interested in returning to work but ha[d] probably missed this opportunity," adding, "I am still having pain…") And she points to no evidence in the record suggesting that she was able to work—even with accommodations—at the time of the termination. Therefore, she has not satisfied the "qualification" element of her prima facie case.

### b. Circumstances Giving Rise to Inference of Discrimination

Even if Montague was qualified for her position at Sodexo, no reasonable juror could find that the termination occurred under circumstances giving rise to an inference of discrimination based on race, color, sex, or religion. There are several ways in which a plaintiff may demonstrate circumstances giving rise to an inference of discrimination. "An inference of discrimination can arise from circumstances including, but not limited to, the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge." *Littlejohn v. City of New York*, 795 F.3d 297, 312 (2d Cir. 2015) (internal quotations omitted). "[A]n inference of discrimination also arises when an employer replaces a terminated or demoted employee with an individual outside the employee's protected class." *Id*. at 312-13. The evidence necessary to satisfy this initial burden is "minimal." *Zimmermann v. Assocs. First Capital Grp.*, 251 F.3d 376, 381 (2d Cir. 2001).

"A plaintiff who claims unlawful discrimination in the termination of employment may prevail notwithstanding the fact that his or her job was eliminated as part of a corporate reorganization or reduction in workforce, for even during a legitimate reorganization or workforce

reduction, an employer may not dismiss employees for unlawful discriminatory reasons." *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 204 (2d Cir. 1995). "The Second Circuit has recognized that a plaintiff . . . may raise a prima facie inference of discrimination by presenting evidence that the employer continued, after discharging the plaintiff, to seek applicants from persons of the plaintiff's qualifications to fill that position." *Hannah v. Wal-Mart Stores, Inc.*, No. 3:12-CV-01361 (VAB), 2016 WL 554771, at *8 (D. Conn. Feb. 11, 2016) (quoting *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 502 (2d Cir. 2009)). The Second Circuit has also "held that plaintiffs raised prima facie inferences of discrimination where, following a reduction in force, the employer hired candidates outside of a plaintiff's protected class, transferred a plaintiff's responsibilities to persons outside of the plaintiff's protected class, and/or failed to hire or consider a plaintiff for vacant positions." *Hannah*, 2016 WL 554771, at *8 (collecting cases).

Montague points to the following as evidence that her termination occurred under circumstances giving rise to an inference of discrimination:

- Montague allegedly received insufficient training in her positions as Operations Manager and General Manager, while her replacement, a younger, white man, appeared to receive more training (ECF No. 60-1 ¶¶ 3-4, 16);

- Montague was removed from the General Manager position and replaced by a younger, white male in July 2012 (ECF No. 60-1 ¶ 15);

- Montague was not invited to participate in conference calls, meals, and meetings with management, while her younger, white male replacement was (ECF No. 58-4 at 48-49);

- A YNHH vice president allegedly made derogatory comments about black women to Montague's late husband, another YNHH employee, in December 2009 or January

2010, after which Montague's late husband relayed these comments to Montague (ECF No. 60-1 ¶ 6);

- The same vice president failed to identify Montague as her husband's widow in an email sent to YNHH employees after Nicholls' death in February 2012 (ECF No. 60-1 ¶ 10);

- While on FMLA leave, Montague heard from another employee that the same vice president wanted to terminate Montague for discriminatory reasons (ECF No. 60-1 ¶ 14);

- Montague saw that her marital status was incorrectly listed as "divorced" rather than "widowed" on an employee record (ECF No. 60-1 ¶ 11);

- Montague felt that she was being supervised more closely than other employees, including by "having to create daily reports," having to meet with a supervisor daily, and having to print out her calendar (ECF No. 58-3 at 7); and

- Montague was transitioned into a temporary role that involved physically difficult tasks, such as consecutive days of data entry, which she believed were "impossible to complete," and which ultimately caused her to suffer an injury.[9] (ECF No. 60 at 12.)

As discussed above, the Court may consider prior allegedly discriminatory acts for which no charge was timely filed as background evidence in support of Montague's timely claim based on her termination. *See Morgan*, 536 U.S. at 113.

While I may consider this evidence as background evidence even though it falls outside the limitations period, there are multiple reasons why this evidence fails to show that Montague's

---

[9] Plaintiff makes other factual assertions in her opposition papers, such as that Dockery would work fewer hours than she did without admonishment. (ECF No. 60 at 11.) However, these are not supported by any evidence in the record.

termination was under circumstances giving rise to an inference of discrimination. First, with respect to Montague's allegations that she received insufficient training, while her younger white male replacement received more training and was invited to participate in more events than she was, these events predated her termination by over a year, and Montague puts forth no admissible evidence showing that her replacement by Dockery was at all related to her termination. And, Montague's deposition testimony contradicts her statements in her affidavit that she received "no" training. (*See, e.g.*, ECF No. 58-3 at 45 (Q: "So Bill would provide you with training on the application whenever you had a question; is that fair to say?" A: "Yes. . . . He would tell me over the phone, walk me through it."); *id.* at 47 (Q: "And did [Amy Bucci] give you any training?" A: Yes."). Moreover, Dockery's alleged statement that he "received a host of training," offered to prove that Dockery received more training from Sodexo than Montague, is inadmissible hearsay that I need not consider on summary judgment. *See* Fed. R. Civ. P. 56(c)(4) (requiring that affidavits "used to support or oppose a motion must . . . set out facts that would be admissible in evidence . . . ."); *Primmer v. CBS Studios, Inc.*, 667 F. Supp. 2d 248, 254 (S.D.N.Y. 2009) ("[T]he Court may . . . simply disregard any material that does not comply with [Rule 56].") (internal quotations omitted).

Second, while Wurcel's alleged derogatory comments are not offered for their truth and would in any event be admissible as statements of a party opponent because of Wurcel's high-ranking position at YNHH, *Zaken v. Boerer*, 964 F.2d 1319, 1323 (2d Cir. 1992) (statement by vice president of employer was admissible against defendant as a statement under Fed. R. Evid. 801(d)(2)(D)), Montague has no personal knowledge of these statements; she claims to know that Wurcel made these statements only because her husband told her so. (ECF No. 60-1 ¶ 7; ECF No. 56-1 at 49.) Montague's husband's statement to her regarding Wurcel's comments, offered to

prove that Wurcel made the comments, is inadmissible hearsay. *See* Fed. R. Evid. 801(c), Fed. R. Evid. 802. Montague also does not provide evidence to show that Wurcel was a decisionmaker in her termination,[10] such that no reasonable jury could conclude that either his comments—made over three years before her termination and after she had received two promotions—or his failure to identify Montague as her husband's widow in the email sent to YNHH employees had any connection to her termination. "[S]tray comments are not evidence of discrimination if they are not temporally linked to an adverse employment action or if they are made by individuals without decision-making authority." *Inguanzo v. Hous. & Servs., Inc.*, No. 12-CV-8212 (ER), 2014 WL 4678254, at *16 (S.D.N.Y. Sept. 19, 2014) (finding that plaintiff "failed to demonstrate any nexus between any of the comments made and her termination"); *see also Meyer v. State of New York Office of Mental Health*, 174 F. Supp. 3d 673, 688-89 (E.D.N.Y. 2016) (holding that plaintiff's assertion that decisionmakers did not like women did not give rise to inference of discrimination, but the fact that decisionmakers made stray remarks about plaintiff's religion *did* give rise to an inference of discrimination, because of evidence that the remarks were connected to the adverse employment action).

Finally, the statement allegedly made by another employee to Montague that Wurcel wanted to terminate Montague for discriminatory reasons, offered to prove that Wurcel in fact wanted to terminate Montague for discriminatory reasons, is similarly inadmissible hearsay. Fed. R. Evid. 801(c); Fed. R. Evid. 802.

Even considering the allegations together, I find that Montague has failed to produce evidence that her ultimate termination was under circumstances that give rise to an inference of

---

[10] Montague testified that Wurcel was her husband's boss. (ECF No. 56-1 at 7.) There is no evidence in the record that Wurcel was Montague's supervisor or had any authority over her.

discrimination on any of the alleged protected characteristics of race, color, sex, or religion. Montague has not put forth any evidence that Sodexo continued to seek applicants with her qualifications to fill positions after she was terminated. Montague has also not put forth any evidence that those affected by Sodexo's elimination of 134 positions on the Healthcare Resource Bench were disproportionately members of any of the protected classes Montague is a member of, that the individuals not laid off or hired after her termination were disproportionately outside of her protected classes, or that her prior responsibilities were transferred to persons outside of her protected classes following her termination.[11] And the record contradicts Montague's claim that Sodexo "could have easily moved Plaintiff to another department," rather than terminate her (ECF No. 60 at 23): it is undisputed that a Sodexo Human Resources Manager spoke with Montague in order to help her find another position following the St. Ray's transition (ECF No. 58-2 ¶ 34; ECF No. 59 at 9-10); the record also suggests that Montague was invited to apply for an open position via email during her medical leave, but that she did not respond to that email until over a month after receiving it, and acknowledged that she had "probably missed th[e] opportunity." (ECF No. 58-9 at 12.)

Montague ultimately fails to meet her burden to establish a prima facie case because her allegations are unsupported by the record, and because she has not put forth evidence disputing the facts asserted by Defendants. The only evidence Montague submits in opposition to summary judgment is her own affidavit, which contradicts her own deposition testimony in key respects and

---

[11] Montague asserts in her opposition brief that of the individuals terminated by Sodexo when it eliminated its Healthcare Resource Bench, 17.6% were African-American, compared to the 11.6% of the Connecticut population that is African-American – but she cites nothing in the record in support of this assertion. (ECF No. 60 at 13.)

will, to that extent, be disregarded.[12] Other portions of Montague's affidavit contain only legal conclusions without pointing to any evidence, such as Montague's claim that she was terminated because she was on leave and had filed a workers' compensation claim (ECF No. 60-1 ¶ 23), and her claim that Defendants' conduct "was systematic and continuous." (ECF No. 60-1 ¶ 27.)

It is true that in the employment discrimination context, "[b]ecause direct evidence of an employer's discriminatory intent will rarely be found, affidavits and depositions must be carefully scrutinized for circumstantial proof, which, if believed, would show discrimination." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) (internal quotations and citations omitted). "However, even in the discrimination context, a plaintiff must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment." *Id*. I find that no reasonable jury could conclude that the circumstances surrounding Montague's termination give rise to an inference of discrimination on the basis of race, color, sex, or religion.[13]

---

[12] For example, Montague stated in her affidavit that she "received no training" in either her Operations Manager or General Manager positions (ECF No. 60-1 ¶¶ 3-4) but testified that she received training from several individuals at Sodexo and took several classes required for her General Manager position. (ECF No. 58-3 at 41, 43, 44-49; ECF No. 58-4 at 1.) *See Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.*, 925 F.2d 566, 572-73 (2d Cir. 1991) ("a party may not, in order to defeat a summary judgment motion, create a material issue of fact by submitting an affidavit disputing his own prior sworn testimony").

[13] Montague has abandoned her religious discrimination claim by failing to address Defendants' arguments regarding this claim. *See Hudson v. Babilonia*, 192 F. Supp. 3d 274, 289 (D. Conn. 2016) ("Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way.") (internal quotations and citation omitted). Moreover, Montague testified that she did not believe YNHH discriminated against on her on the basis of religion. (ECF No. 56-1 at 60.) With respect to Sodexo, Montague testified she believed she was discriminated on the basis of her Pentecostal religion when she was "excluded from things that other GMs were included in, such as the weekly . . . district manager calls," and when district managers "visited [certain] accounts on a monthly basis." (ECF No. 58-6 at 22-23, 28-29.) However, Montague testified that she did not know whether her district manager at the relevant time knew of her religion, and that she did not know the religion of the other General Managers whom she alleges were treated more favorably than she was. (ECF No. 58-6 at 23, 27-29.) Montague merely asserts her belief that her

### c. Legitimate, Non-Discriminatory Reason for Termination

Even if Montague were able to establish a prima facie case of discrimination, Defendants have put forth a legitimate, non-discriminatory reason for her termination—that Sodexo decided to eliminate all 134 positions on its Healthcare Resource Bench, including Montague's. (ECF No. 58-2 ¶ 43.) The Second Circuit has held that downsizing through layoffs due to a reduced employment need is a legitimate, nondiscriminatory reason for termination. *See Windham v. Time Warner, Inc.*, 275 F.3d 179, 188 (2d Cir. 2001) (affirming district court finding that defendant met its burden of producing evidence of a legitimate business reason for the termination by demonstrating that the department in question had less work); *Jaiyeola v. Carrier Corp.*, 350 F. Appx. 583, 585 (2d Cir. 2009) (acknowledging that downsizing of a department in which plaintiff was the weakest performer, leading ultimately to the elimination of the entire department, was a legitimate, non-discriminatory reason for termination). Therefore, Defendants have met their burden of establishing a legitimate non-discriminatory reason for the termination.

### d. Pretext

Because Defendants have articulated a legitimate, non-discriminatory reason for the termination, the burden shifts back to Montague to establish that the proffered reason was pretext for discrimination. *Slattery v. Swiss Reins. Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001). "To qualify as pretext, it must be 'shown *both* that the reason was false, *and* that discrimination was the real reason.'" *Gooding v. Walgreens Home Care, Inc.*, No. 3:11-CV-856 (JCH), 2013 WL 3338568, at *7 (D. Conn. July 2, 2013) (quoting *St. Mary's Honor Ctr. V. Hicks*, 509 U.S. 502, 515 (1993)).

---

"religion played a part," (ECF No. 58-6 at 21), which is insufficient to raise an inference of discrimination.

Here, Montague received ample notice that her position was in jeopardy of termination, because of low performance scores, because her temporary assignment handling the St. Ray's transition was scheduled to end on a certain date, and because the Healthcare Resource Bench was scheduled to be eliminated on a certain date. (ECF No. 58-2 ¶¶ 27, 40; ECF No. 58-4 at 12, 52-53; ECF No. 58-8 at 40; ECF No. 58-9 at 15-17). *See Johnson v. C. White & Son Inc.*, 772 F. Supp. 2d 408, 417-18 (D. Conn. 2011) (where plaintiff received warnings about poor job performance and did not provide evidence of pretext, finding that the decision to terminate him was based on performance). Her replacement by a younger, white male in the General Manager position occurred over a year before her termination and, as discussed, there is no evidence that it was connected to her termination. (ECF No. 58-2 ¶¶ 22-23.) Montague implies in her opposition papers that Sodexo should have done more to find her an available position prior to the scheduled elimination of the Healthcare Resource Bench, and that its failure to do so is evidence of pretext (ECF No. 60 at 13-14), but ignores the evidence that Sodexo did in fact reach out to Montague about a position and that she failed to respond until over a month later. (*See* ECF No. 58-2 ¶ 38; ECF No. 58-9 at 11-12.) Montague cites no evidence in the record to suggest that the proffered reason for Montague's termination was false, or that discrimination was the real reason. Montague's claim of disparate treatment based on her termination fails as a result.

### 3. Disparate Treatment Based on Hostile Work Environment

Montague also asserts that she was subject to a hostile work environment in violation of Title VII. Montague concedes that a hostile work environment claim based on any of the alleged discriminatory acts, standing alone, would be time-barred under the 300-day statute of limitations for charges of discrimination. (ECF No. 60 at 14.) Under *Morgan*, however, for her hostile work environment claim to be timely, Montague need only have alleged at least one harassing act that

occurred on or after April 3, 2013, i.e., 300 days before she filed her CHRO charge. *See Morgan*, 536 U.S. at 122. As discussed above, the only discriminatory act that Montague asserts occurred after April 3, 2013 is her termination on August 2, 2013. But termination, even if on its own discriminatory, without evidence that it was in furtherance of an alleged practice of harassment, is insufficient to render untimely hostile work environment practices actionable. *See Patterson*, 375 F.3d at 220. Thus, the timeliness of Montague's claim depends on whether she has proffered evidence that her termination was in furtherance of the harassment that she alleges Defendants engaged in, i.e., whether the termination contributed to the hostile work environment. Courts recognize that hostile work environment claims and discrete acts, such as termination, are fundamentally "different in kind." *Morgan*, 536 U.S. at 114-15. *See also Darling v. Potter*, No. 3:04-CV-1467 (PCD), 2005 WL 2045951, at *4 (D. Conn. Aug. 25, 2005) (recognizing that a hostile work environment's "constituent parts are different in kind from discrete acts"). I have already concluded that there is no evidence that the termination was discriminatory, and thus, it could not have been part of a discriminatory hostile work environment. Nonetheless, I will independently consider whether Montague has put forth sufficient evidence to support her hostile work environment claim even based on the time-barred acts.

"[T]o survive summary judgment on a claim of hostile work environment harassment, a plaintiff must produce evidence that the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment." *Aulicino v. New York City Dep't of Homeless Servs.*, 580 F.3d 73, 82 (2d Cir. 2009) (internal citations and quotation marks omitted). "This test has objective and subjective elements: the misconduct shown must be 'severe or pervasive enough to create an objectively hostile or abusive work environment,' and the victim must also subjectively perceive that environment to be

abusive." *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).

As a general rule, alleged incidents must be more than "episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Alfano*, 294 F.3d at 374 (internal citations and quotation marks omitted). "Isolated acts, unless very serious, do not meet the threshold of severity or pervasiveness." *Id*. But it is "well-settled in [the Second] Circuit that even a single act can meet the threshold if, by itself, it can and does work a transformation of the plaintiff's workplace." *Id*. "[T]he test is whether 'the harassment is of such quality or quantity that a reasonable employee would find the conditions of her employer *altered for the worse*.'" *Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir. 2003) (quoting *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 70 (2d Cir. 2000) (emphasis in original)). Among the factors courts consider when determining whether an environment is sufficiently hostile are "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Terry*, 336 F.3d at 148 (quoting *Harris*, 510 U.S. at 23). "Whether the challenged conduct is sufficiently severe or pervasive depends on the totality of the circumstances." *Aulicino*, 580 F.3d at 82 (internal citations and quotation marks omitted).

Montague must also show that "the conduct occurred because of [the protected characteristic]." *Alfano*, 294 F.3d at 374. Finally, Montague "must demonstrate a specific basis for imputing the conduct creating the hostile work environment to the employer." *Feingold v. New York*, 366 F.3d 138, 150 (2d Cir. 2004); *Gregory v. Daly*, 243 F.3d 687, 702 n.3 (2d Cir. 2001) ("For liability to attach, the employer must also be responsible for the conduct at issue.").

Montague's principal evidence in support of her hostile work environment claim are allegedly derogatory comments made by a YNHH Vice President to her husband. The record makes clear that Montague subjectively perceived these acts to be severe and pervasive, and that Montague believed that she would not have been treated in this manner if it were not for her race or color. (*See, e.g.*, ECF No. 58-4 at 46-47 (deposition testimony that learning of Wurcel's comments to her husband created an "intimidating and hostile work environment" for Montague); ECF No. 56-1 at 39 (deposition testimony that Montague believed Wurcel would not have failed to acknowledge her as her husband's widow in a management-wide email unless he disapproved of her marriage to Nicholls because of her race).)

However, a jury could not reasonably find that the isolated derogatory comments made about Montague to her late husband give rise to a hostile work environment claim. First, the remarks were not made to her or in her presence, and, as discussed above, her husband's statement relaying them to her, the only evidence they were made at all, is inadmissible hearsay. Second, even if supported by admissible evidence, the comments are too isolated to amount to a hostile work environment. Conduct that is "merely offensive," while unfortunate, does not rise to the level of a hostile work environment. *Leibovitz v. New York City Transit Auth.*, 252 F.3d 179, 189 (2d Cir. 2001). Stray remarks, even when they reference the plaintiff's protected characteristics, are not considered sufficiently severe to give rise to a hostile work environment claim. *See, e.g.*, *Paul v. Postgraduate Ctr. for Mental Health*, 97 F. Supp. 3d 141, 184 (E.D.N.Y. 2015) (comment that plaintiff was an "old Haitian" was a stray remark that did not support a hostile work environment claim); *Rivera v. Brooklyn Hosp. Med. Ctr.*, 28 F. Supp. 3d 159, 163 (E.D.N.Y. 2014) (dismissing plaintiff's hostile work environment claim where only one remark referenced the plaintiff's ethnic origin in the entirety of his hostile work environment allegations, making it "the classic 'stray

remark' which, standing along, will not support . . . a hostile work environment claim"); *McKenna v. VCS Grp. LLC*, No. 3:08-CV-1563 (VLB), 2009 WL 3193879, at *5-6 (D. Conn. Sept. 30, 2009) (finding that allegations on fifteen occasions over the course of seven months about plaintiff's body and marital status were insufficient to state a hostile work environment claim); *cf. Marino v. EGS Electrical Grp., LLC*, No. 3:12-CV-518 (JBA), 2014 WL 1289453, at *9 (D. Conn. Mar. 31, 2014) (denying summary judgment with respect to hostile work environment claim where plaintiff alleged that she and other nonwhite coworkers were subject to racist remarks and threatening taunts and gestures for over a year). Third, Montague has not put forth any evidence that the comments had a direct impact on her work environment. There is no evidence that Wurcel was Montague's supervisor or co-worker; she submitted no evidence that she had any work-related contact with Wurcel. (*See* ECF No. 56-1 at 7-8 (testimony that Wurcel was Montague's husband's boss and worked for YNHH).)

Montague also claims that Defendants "engaged in a process of continuing and progressively worse treatment" of Montague. (ECF No. 1 ¶ 11.) Montague asserts that she received less training for her position than a younger, white man (ECF No. 58-4 at 2-4); that she was subject to greater scrutiny in performing her job than others were (ECF No. 58-3 at 8); that she was not invited to participate in conference calls, meals, and meetings with management while a younger, white man in the same position was (ECF No. 58-4 at 48-49); and that she was given what she claims were "physically grueling" tasks, as a result of which she suffered a physical injury. (ECF No. 60 at 21.)

These alleged incidents—even taken together with Wurcel's alleged comments—were too infrequent to permit a reasonable jury to find that Montague's work environment was so permeated with intimidation, insult, and ridicule as to alter the terms and conditions of her employment. *See*

*Paul v. Postgraduate Center for Mental Health*, 97 F. Supp. 3d 141, 182 (E.D.N.Y. 2015) (finding that plaintiff's allegations failed to establish sufficient frequency for a hostile work environment claim where the incidents happened on five occasions over the course of roughly fourteen months). Montague points to a few concrete incidents that occurred over the course of four years, otherwise making general, unsupported allegations of continuous conduct. *See Lucas v. South Nassau Cmty. Hosp.*, 54 F. Supp. 2d 141, 148-149 (E.D.N.Y. 1998) (finding that plaintiff did not establish a pervasive hostile work environment where the plaintiff "alleged a handful of indeterminate encounters with a few explicit events").

A reasonable jury also could not find Montague's other alleged incidents to have been severe. Courts in the Second Circuit have held that both "typical office disputes" and "unfortunate stray marks" are not considered severe. *Paul*, 97 F. Supp. 3d at 183. Montague's claim that she received inequitable training compared to a younger, white man is based only on her assertion (as noted, based on hearsay) that he told her he received a "host" of training and appeared more knowledgeable about an application than she felt she was. But Montague herself received training from several individuals at Sodexo and testified that she took all required classes for her General Manager position. There is thus some doubt as to whether this constituted disparate treatment at all; the evidence that it did is vague, at best. And Montague's claims that she was left out of conference calls, meals, and meetings with management, and that she was subject to scrutiny in performing her job, amount to "nothing more than workplace dynamics." *Davis-Molinia v. Port Auth. of N.Y. & N.J.*, No. 08 CV 7584 (GBD), 2011 WL 4000997, at *11 (S.D.N.Y. 2011) (dismissing claim that plaintiff was subject to a hostile work environment on the basis of her race where plaintiff was excluded from staff meetings, was required to submit a list of her duties to supervisors, was avoided in the office and was spoken to in a "nasty way," among other

allegations); *see also Littlejohn v. City of New York*, 795 F.3d 297, 321 (2d Cir. 2015) (holding that hostile work environment claim was properly dismissed where predicated on allegations that negative statements were made about plaintiff, that plaintiff was replaced at meetings, and that plaintiff was wrongfully reprimanded). Montague has put forth no evidence that any of these incidents had any link to her race, color, or sex. (*See* ECF No. 58-6 at 9 (deposition testimony by Montague that she did not know if her alleged exclusion from meetings and conference calls was because of her race, but that she "just [didn't] know how else" to explain it).) Montague's Title VII claim, whether premised on an adverse employment action or hostile work environment, therefore fails.

### B. ADEA Claim

In Count Two, Montague claims that Defendants discriminated against her on the basis of her age, in violation of ADEA. Like Title VII, the ADEA requires that claims of age discrimination be filed with an administrative agency no later than 300 days after the allegedly discriminatory act occurred. *See* 29 U.S.C. §§ 626(d)(1)(B), 633(b). ADEA claims also follow the *McDonnell Douglas* framework, such that the analysis for Montague's ADEA claim largely tracks the analysis of her Title VII claim. *Gorham v. Town of Trumbull*, 7 F. Supp. 3d 218, 230 (D. Conn. 2014).

The only conduct by Defendants that remotely implicated Montague's age was Montague's replacement by a younger man in the General Manager position. This conduct, if a timely basis for a claim, would raise an inference of discriminatory intent. *See Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 135 (2d Cir. 2000) ("[A] plaintiff has demonstrated an inference of age discrimination and thus established a prima facie case . . . where the majority of [the] plaintiff's responsibilities were transferred to a younger person . . ."). However, it is undisputed that Montague's replacement by Dockery in the General Manager position occurred in March 2012,

such that any claim based on this conduct is time-barred. And, as discussed above, Montague has put forth no evidence suggesting that the circumstances surrounding her termination give rise to an inference of discrimination on the basis of any protected characteristic, including age. Montague has also not put forth any evidence that suggests she was subject to severe and pervasive harassing conduct because of her age. Montague's ADEA claim necessarily fails.

### C. ADA Claim

In Count Four, Montague claims that Defendants discriminated against her on the basis of disability in violation of the ADA. Specifically, Montague claims that she was discriminated against on the basis of her work-related injury, after which she was diagnosed with a herniated disc. (ECF No. 56-1 at 61.)

The ADA incorporates the procedures for bringing suit laid out in Title VII. 42 U.S.C. § 12117(a). Thus, like for her Title VII and ADEA claims, Montague must have filed her administrative complaint within 300 days of an employment practice she alleges violated the ADA.

Disability discrimination claims follow the *McDonnell Douglas* burden shifting analysis. *McBride v. BIC Consumer Prods. Mfg. Co.*, 583 F.3d 92, 96 (2d Cir. 2009) (explaining that in the ADA context, "[a] plaintiff must establish a prima facie case; the employer must offer through the introduction of admissible evidence a legitimate non-discriminatory reason for [its adverse employment action]; and the plaintiff must then produce evidence and carry the burden of persuasion that the proffered reason is a pretext") (internal citations and quotation marks omitted).

To establish a prima facie case of discrimination under the ADA, a plaintiff must show that "(1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered adverse employment action because of his disability." *Sista*

*v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006) (internal citations and quotation marks omitted). Here, Defendants dispute only the second and fourth elements. Under the ADA, "[t]he term 'qualified individual' means an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position . . . ." 42 U.S.C. § 12111(8). The ADA provides that "consideration shall be given to the employer's judgment as to what functions of a job are essential . . . ." *Id.*

Montague argues that at the least, a genuine issue of material fact exists as to whether Montague was completely unable to return to work in manner that would render her unqualified. As discussed above, no reasonable jury could find that Montague was qualified for her position at the time of her termination, given the undisputed fact that she was "completely unable to return to work" until May 2016. (ECF No. 58-2 ¶ 44; ECF No. 58-4 at 25-26; ECF No. 58-9 at 23.)

Even if she were qualified, however, Montague cannot make out a prima facie case of disability discrimination because she has not established that her termination was under circumstances giving rise to an inference of discrimination on the basis of disability. With respect to YNHH, Montague disavowed any claim of disability discrimination, testifying that she did not "believe that Yale-New Haven Hospital" discriminated against her on the basis of a physical disability, and that she did not know whether YNHH was aware of her injury or diagnosis. (ECF No. 56-1 at 61-62.) With respect to Sodexo, the record demonstrates that Montague was informed that her temporary assignment would end, and that she would have to apply for another position in order to remain employed at Sodexo, well before she suffered her injury. (ECF No. 58-2 ¶ 40; ECF No. 58-4 at 52-53; ECF No. 58-9 at 15-17.) And a Sodexo representative reached out to her after she went on medical leave as a result of her injury in order to gauge Montague's interest in applying for an open position at the company. (ECF No. 58-9 at 12.) In short, Montague points to

no evidence in the record suggesting that her termination was because of her alleged disability. Thus, no reasonable jury could conclude that Montague's termination was because of her disability, rather than because Montague was transferred to a temporary assignment before her injury, her temporary assignment ended as scheduled, Sodexo decided to downsize by eliminating its Healthcare Resource Bench, and Montague did not apply for another position at the company. Montague's ADA claim therefore fails.

### D. Workers' Compensation Retaliation Claim

In Count Three, Montague claims that Defendants discriminated against her on the basis of her filing of a workers' compensation claim under Conn. Gen. Stat. § 31-290a, which states that "[n]o employer who is subject to the provisions of this chapter shall discharge, or cause to be discharged, or in any manner discriminate against any employee because the employee has filed a claim for workers' compensation benefits or otherwise exercised the rights afforded to him pursuant to the provisions of this chapter." Conn. Gen. Stat. § 31-290a. To support this claim, Montague states in her affidavit that she was terminated because she "was on leave and filed a workers' compensation claim" after suffering a shoulder injury at work. (ECF No. 60-1 ¶ 23.)

Defendants argue that Montague released her claim for retaliation on the basis of her filing a workers' compensation claim by entering into the Stipulation, which "specifically release[d] all of the Claimants' rights pursuant to CGS § 31-290a." (ECF No. 58-9 at 54.). Montague does not respond to this argument in her opposition brief, such that I may deem her claim abandoned. *See Hudson v. Babilonia*, 192 F. Supp. 3d 274, 289 (D. Conn. 2016).

Nonetheless, though Montague does not make this argument, the language of the settlement agreement is arguably ambiguous, as it "releases all of the Claimants' [*sic*] rights pursuant to CGS § 31-290a," but "specifically does not release or waive any rights and claims pursuant to federal

or state statutes, common law or regulations, as they pertain to work place discrimination . . . as claimed in [Montague's] federal court action against [Sodexo and YNHH]," leaving unclear whether the former clause is an exception to the latter. (ECF No. 58-9 at 54.) Because there is a genuine dispute as to whether Montague released her workers' compensation retaliation claim, I will independently consider the merits of her claim.

Analysis of a retaliation claim under Conn. Gen. Stat. § 31-290a follows the *McDonnell Douglas* burden-shifting framework. *See Dupee v. Klaff's, Inc.*, 462 F. Supp. 2d 233, 239-40 (D. Conn. 2006). "To make out a prima facie case of retaliation, an employee must show that the employee was engaged in protected activity; that the employer was aware of that activity; that the employee suffered adverse employment decisions; and that there was a causal connection between the protected activity and the adverse employment action." *Id.* (quoting *Collins v. New York City Transit Auth.*, 305 F.3d 113, 118 (2d Cir. 2002)).

Montague put forth no evidence that her termination was at all connected to the filing of her workers' compensation claim, except for the fact that the filing of her claim predated her termination by eight months, and that she was terminated while on medical leave. (ECF No. 60-1 ¶ 23.) The eight-month gap "is not too temporally disconnected to support an inference of retaliation." *Dupee*, 462 F. Supp. 2d at 240 (finding that a 13-month gap was substantial but supported an inference of retaliation); *see also Grant v. Bethlehem Steel Corp.*, 622 F.2d 43, 45-46 (2d Cir. 1980) (holding that an eight-month gap between the filing of an EEOC complaint and retaliatory action suggested a causal relationship).

However, courts have held that such a gap does not, on its own, give rise to an inference of discrimination where no other evidence is offered to support a claim of retaliation. *See Muoio v. Costco Wholesale Corp.*, No. No. 3:13-CV-44 (SRU), 2015 WL 222160, at *15 (D. Conn. Jan.

14, 2015) (finding that ten-month gap, without any other evidence that plaintiff was terminated for exercising his workers' compensation rights, was insufficient to meet evidentiary burden with respect to the causation element). Moreover, "[a]bsent any other evidence of retaliatory motive, mere temporal proximity alone is insufficient." *Lajeunesse v. Great Atlantic & Pacific Tea*, 160 F. Supp. 2d 324, 334 (D. Conn. 2001) (granting summary judgment on claim under Conn. Gen. Stat. § 31-290a where plaintiff put forth no evidence of retaliatory motive aside from the fact that he was terminated two months after filing a workers' compensation claim) (citing *Gallo v. Eaton Corp.*, 122 F. Supp. 2d 293, 303-04 (D. Conn. 2000); *see also Hollander v. Am. Cyanamid Co.*, 895 F.2d 80, 85-86 (2d Cir. 1990) (finding no prima facie case of retaliation where plaintiff only offered evidence that adverse employment action occurred three months after filing agency complaint).

Here, Montague provides only conclusory allegations that she was "terminated . . . because [she] was on leave and filed a workers' compensation claim" (ECF No. 60-1 ¶ 23) and that the "termination was part of a continuing violation of previous discriminatory behavior," (ECF No. 61 at 8) without pointing to any evidence of retaliatory motive. Montague therefore fails to establish a prima facie case of discrimination, such that her workers' compensation retaliation claim fails. And in any event, as shown, Sodexo has provided a legitimate reason for her termination, and she has not submitted any evidence suggesting it was pretextual.

### E. CFEPA Discrimination Claim

In Count Six, Montague claims that Defendants discriminated against her on the basis of race[14] in violation of the CFEPA, Conn. Gen. Stat. § 46a-60 *et seq*. Under CFEPA, a claim must

---

[14] Count Six references only race discrimination, but it is unclear from Montague's factual allegations whether she asserts discrimination on the basis of other protected characteristics under CFEPA.

be filed within 180 days after the alleged act of discrimination occurred. Conn. Gen. Stat. § 46a-82(f); *see also O'Hazo v. Bristol-Burlington Health Dist.*, 599 F. Supp. 2d 242, 252 (D. Conn. 2009). The 300-day filing period applicable to claims under Title VII, the ADA, and the ADEA does not apply to claims brought under CFEPA. *Kelly v. Am. Med. Response, Inc.*, No. CV095025835, 2009 WL 2450730, at *3-4 (Conn. Super. Ct. July 7, 2009) (explaining that the 180-day time limit applies to claims brought under CFEPA, even when those claims are brought in conjunction with claims under federal employment discrimination claims). Montague's CFEPA claim is therefore time-barred to the extent it is based on acts that occurred prior to August 1, 2013.

Though she received notice of her anticipated last date of employment in a letter dated July 31, 2013 (ECF No. 58-2 ¶ 42; ECF No. 58-4 at 54; ECF No. 58-9 at 19), Montague's last day of employment was August 2, 2013, when Sodexo terminated the employment of all 134 employees on its Healthcare Resource Bench. (ECF No. 58-2 ¶ 43; ECF No. 58-8 at 4 ¶ 10; ECF No. 60-1 ¶ 23.) Thus, Montague's claim is arguably timely if based on her August 2, 2013 termination.

"Other than the CFEPA's broader definition of disability, claims under the CFEPA are analyzed using the same burden shifting framework set forth by the Supreme Court in *McDonnell Douglas* for use in Title VII, ADA, and ADEA cases." *DeAngelo v. Yellowbook Inc.*, 105 F. Supp. 3d 166, 180 (D. Conn. 2015) (internal quotations and citations omitted). Therefore, because Montague has put forth no evidence that her termination occurred under circumstances giving rise to an inference of discrimination on the basis of any protected characteristic, and has in any event failed to introduce evidence of pretext at the third step of the *McDonnell Douglas* framework, Montague's CFEPA claim fails along with her Title VII, ADEA, and ADA claims.

## F. Intentional Infliction of Emotional Distress

In Count Five, Montague alleges that she experienced severe distress as a result of the allegedly racially derogatory comments made by Wurcel to Nicholls in December 2009 or January 2010, the email circulated by Wurcel that failed to acknowledge Montague as her husband's widow immediately following Nicholls' death in February 2012, and seeing her marital status listed as "divorced" rather than "widowed" on her employee record, despite her divorce not being finalized. (ECF No. 56-1 at 67-68.)

Montague's claim is subject to Connecticut's three-year statute of limitations for tort claims. *See Rivera v. Men's Wearhouse, Inc.*, No. 3:05-CV-1907 (WWE), 2006 WL 1801705, at *4 (D. Conn. June 27, 2006) (acknowledging that intentional infliction of emotional distress claim is controlled by the Connecticut personal injury statute of limitations, three years); *Ortiz v. Prudential Ins. Co.*, 94 F. Supp. 2d 225, 233 (D. Conn. 2000) (applying three-year statute of limitations for tort claims brought in employment discrimination suit).

As Montague filed her civil suit on June 23, 2015, [15] her intentional infliction of emotional distress claim is time-barred to the extent it relies on any conduct that occurred prior to June 23, 2012, three years prior to filing suit. Therefore, her claim is time-barred if based on Wurcel's alleged racially derogatory comments and the email Wurcel circulated following Nicholls' death. However, it is unclear when Montague first saw that her marital status was incorrectly listed as "divorced" rather than "widowed." Because the form itself is dated September 27, 2012 (ECF No. 58-9 at 48), within the statute of limitations, I consider whether this incident suffices as the basis for an intentional infliction of emotional distress claim.

---

[15] Montague's complaint was docketed on June 24, 2015, but dated June 23, 2015. This distinction is immaterial for the purposes of determining the timeliness of Montague's intentional infliction of emotional distress claim.

To prevail on a claim of intentional infliction of emotional distress under Connecticut law, Montague must show (1) that Defendants intended to inflict emotional distress or that they knew or should have known that emotional distress was the likely result of their conduct; (2) that the conduct was extreme and outrageous; (3) that Defendants' conduct caused Montague's distress; and (4) that Montague sustained severe emotional distress. *See Appleton v. Bd. of Educ. of Town of Stonington*, 254 Conn. 205, 210 (2000).

"Connecticut courts have narrowly defined the boundaries of extreme and outrageous conduct." *Sacco v. Paradigm New Haven Health Care, LLC*, No. 3:12-CV-1207 (WWE), 2013 WL 2321709, at *2 (D. Conn. May 28, 2013). "Whether a defendant's conduct is sufficient to satisfy the requirement that it be extreme and outrageous is initially a question for the court to determine. Only where reasonable minds disagree does it become an issue for the jury." *Id.* (internal citations omitted). A defendant is liable for intentional infliction of emotional distress

> only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, Outrageous!

*Appleton*, 254 Conn. at 210-11 (internal quotations and citations omitted). "Conduct on the part of the defendant that is merely insulting or displays bad manners or results in hurt feelings is insufficient to form the basis for an action based upon intentional infliction of emotional distress." *Carrol v. Allstate Ins. Co.*, 262 Conn. 433, 443 (2003) (internal quotations and citations omitted).

Even if distressing to Montague, Defendants' conduct was less extreme than conduct Connecticut courts have found to be insufficient to support a claim for intentional infliction of emotional distress in the employment context. *See Lute v. Dominion Nuclear Conn., Inc.*, No. 3:12-CV-01412 (MPS), 2015 WL 1456769, at *17 (D. Conn. Mar. 30, 2015) (collecting cases); *see*

*also, e.g.*, *Appleton*, 254 Conn. at 211 (holding that supervisor's conduct toward plaintiff, including making condescending comments, questioning plaintiff's ability to read, calling the police who escorted plaintiff out of the building, subjecting plaintiff to two psychological examinations, and forcing plaintiff to take a suspension and a leave of absence, did not constitute extreme and outrageous conduct); *Tracy v. New Milford Pub. Sch.*, 101 Conn. App. 560, 567-68 (2007) (holding that defendant's harassment, intimidation, defamation, and discipline of plaintiff without a proper investigation were not extreme and outrageous); *Gillians v. Vivanco-Small*, 128 Conn. App. 207, 213 (2011) (holding that allegations that defendant co-workers conspired to create hostile work environment, falsely accused plaintiff of racial and sexual bias, and gave plaintiff negative performance evaluations were insufficient for intentional infliction of emotional distress claim); *Dollard v. Bd. of Educ. of Town of Orange*, 63 Conn. App. 550, 552-53 (2001) (holding that allegations that defendant engaged in a concerted plan to force plaintiff to resign "or to become so distraught that [defendant] would have a colorable basis for terminating her employment" by "hypercritically examining every small detail of her professional and personal conduct," transferring her to another school and then secretly hiring a replacement, and publicly admonishing her were insufficient for claim of intentional infliction of emotional distress).

With respect to Montague's incorrect marital status, Montague testified that she did not know whether people assumed she was divorced because she was within days of getting divorced when Nicholls died. (ECF No. 56-1 at 71.) Montague also testified that she did not know whether anybody wrote the incorrect marital status intentionally to cause her severe emotional distress. (ECF No. 56-1 at 71.) Montague testified that she knew Wurcel was involved with the incorrect form because "[i]t was his department," but later conceded that she did not know who made the change on the form. (ECF No. 56-1 at 70-71.) Finally, Montague testified that she had six deaths

in her family in a matter of six months, including her husband's. (ECF No. 56-1 at 71.) Montague

further testified, "When I filed the claim, those things were going on in my life, and contrary to

what some people knew, my husband and I had talked about getting back to together . . . . And so

it hit me pretty hard when he ended up passing away . . . . That was the culmination of six months,

six deaths, and I was just done emotionally." (ECF No. 56-1 at 72.) When asked whether she could

allocate her severe emotional distress to YNHH, Montague testified, "I can't compartmentalize,

but it all added to." (ECF No. 56-1 at 73.)

Montague has not put forth evidence to demonstrate that listing an incorrect marital status

was intentional, extreme, or outrageous conduct, or that encountering the incorrect record was the

cause of any distress she suffered. Even if Wurcel's alleged comments and the email circulated to

YNHH staff are added to the mix, Montague's claim fails to meet the high bar for the tort of

intentional infliction of emotional distress.[16]

## IV.   Conclusion

For the reasons stated above, Defendants' Motions for Summary Judgment are

GRANTED.


IT IS SO ORDERED.

_____
/s/
Michael P. Shea, U.S.D.J.

Dated:        Hartford, Connecticut
              October 6, 2017

---

[16] Montague argues that the continuing course of conduct doctrine applies to her intentional infliction of emotional distress claim. (ECF No. 61 at 8.) I need not consider whether this doctrine applies to Montague's claim, as the claim fails on the merits, even considering Wurcel's alleged comments and the email sent to YNHH sent, both time-barred acts.